J-S32018-25                    2026 PA Super 12

| | | |
|---|---|---|
| TEDD AND SHARON BIERNSTEIN | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| ALEEBANESE FOOD, LLC AND ALI | : | |
| KABALAN | : | |
| | : | |
| Appellants | : | No. 1876 MDA 2024 |

Appeal from the Judgment Entered March 3, 2025
In the Court of Common Pleas of Union County Civil Division at No(s):
21-0303, 22-0256

BEFORE:   LAZARUS, P.J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

OPINION BY KUNSELMAN, J.:                    **FILED: JANUARY 20, 2026**

## I.      Introduction

In this landlord-tenant dispute involving consolidated cases (docketed below at 21-0303 and 22-0256), the Tenants, Aleebanese Food, LLC and Ali Kabalan, appeal from the judgment of $10,463.17 entered on the jury verdict in favor of the Landlords, Tedd and Sharon Biernstein.  We vacate the judgment entered in case 21-0303, because the trial court lacked appellate jurisdiction over it.  That lack of jurisdiction also partially sullied the judgment at 22-0256.  Thus, we must reduce the verdict and judgment in that case to $8,947.

## II.     Facts & Procedural Background

On June 23, 2020, the Landlords and Tenants signed a two-year lease for commercial property in Lewisburg, Pennsylvania.  According to the lease,

---

[*] Former Justice specially assigned to the Superior Court.

the Tenants owed the Landlords a $2,000 security deposit "prior to occupancy of the premises."  Landlords' Ex. 1 at 4, ¶8.  Additionally, the Tenants agreed to pay:

> for all utility and service costs to the premises, including but not limited, to the following:
>
> . . .
>
> 4.2   sewer service to the building;
>
> . . .
>
> 4.5   trash servicing for the leased premises;
>
> . . .
>
> 4.11  clean the grease trap no less than twice a year;
>
> . . .
>
> 4.15  plumbing services within the leased property . . . .

*Id.* at 2-3, ¶4 (some capitalization omitted).

If the Tenants breached the lease, the Landlords could terminate it and seek a judgment of possession.  The Landlords could also bring "an action to recover . . . charges due, . . . together with any and all consequential damages caused by [the Tenants' breach,] including reasonable attorney fees and court costs."  *Id.* at 5, ¶9.

Immediately after signing the lease, the Tenants occupied the premises and opened a restaurant.  They did not pay the $2,000 security deposit.  *See* N.T., 10/1/24, at 6.

Eight months later, in February of 2021, the Landlords sent the Tenants a notice to vacate the premises. **See** Landlords' Ex. 2. The Landlords accused them of breaching the lease by (1) failing to pay the $2,000 security deposit; (2) altering the premise without the Landlords' consent by removing light fixtures; (3) failing to clean the grease trap at least twice per year; and (4) failing to clean the ice machine at least twice per year. **See id.** The Landlords gave the Tenants until March 31, 2021 to vacate.

A day before the deadline, the Tenants paid the Landlords $2,000 for the security deposit. **See** Landlords' Ex. 3. They refused to leave. On April 22, 2021, the Landlords sued the Tenants in the Magisterial District Court of Lewisburg and sought to evict them.[1]

Following an evidentiary hearing, the court ruled in favor of the Tenants on all counts. The learned Magisterial District Judge Jeffery A. Rowe issued a detailed, well-reasoned opinion explaining his decision as follows:

> Regarding the [Tenants'] failure to pay the security deposit, the complaint specifically states that the lease has been breached due to the Tenants' failure to pay the security deposit, not for the Tenants' failure to **timely** pay the security deposit. There was much testimony at trial regarding the timeliness of the Tenants' payments of either rent or security deposits, or lack thereof. However, the only allegation set forth in the complaint was that the Tenants failed to pay the security deposit. All parties agree that the security deposit has now been paid, albeit untimely; therefore, that breach has been cured . . .

_____

[1] The action originally received docket number MJ-17301-LT-0000004-2021. For the sake of clarity, we refer to that initial proceeding before the magisterial district court by its trial-court docket number throughout most of this Opinion.

[Also], the Tenants provided evidence that the grease trap and ice machine had been cleaned recently. The lease requires both of those items to be cleaned "no less than twice a year." [Landlords' Ex. 1 at 3, ¶4.10, 4.11.] While common sense would dictate that such a provision should be interpreted as requiring those items to be cleaned once every six months, that's not what the lease states. The lease's plain language sets forth the respective obligations of the parties and must control the outcome here. Because the lease was signed on June 23, 2020 – not yet a year ago – the Tenants cannot yet have breached the applicable provisions of the lease. Simply put, the Landlords' claim is premature . . .

Further, [Mr. Biernstein's] testimony was rather conclusory. [He] testified that the items had not been cleaned, yet [Mr. Biernstein] did not say on what date he observed those items in an unclean condition. When presented with pictures of the recently cleaned ice machine, [Mr. Biernstein] testified that it did not appear to have been cleaned in the same manner as it had been in the past by a different servicer. In [the magisterial court's] judgment, this testimony does not rise to meet the burden of proof required [of the Landlords].

The Landlords' final claim is that the premises was altered without [their] permission, specifically that "light fixtures have been removed and altered." [Landlords' Complaint in Magisterial Court. Mr. Biernstein] testified that shades or covers were removed from various lights in the store and that lights had been replaced. [But he] failed to provide any detail regarding how the lights were different from what was in place previously.

[Mr. Kabalan] testified that any shades or covers were removed with the Landlords' permission and were carefully packaged and stored on the premises, should the Landlords desire to use them again in the future. [He] denied replacing any lights and insisted that the lights were raised simply by looping and securing the cable that extends from the ceiling to the light itself. Per [Mr. Kabalan], this is easily undone . . . Give that neither the removal of covers nor the repositioning of the lights [is] permanent, [the magisterial court] finds that the Tenants did not alter the lighting fixtures.

[Furthermore,] the Landlords asserted that a light and cover had been removed from an exterior light . . . Regardless of

whether the light and cover were present [when] the Tenants took possession of the premises, or who removed the light and cover, this change is a purely aesthetic, non-permanent, and exceptionally minor change . . . it is easily undone. [The magisterial court] does not consider this to be an "alteration" as that word is commonly used in the lease contract.

Magisterial District Court Opinion, 5/17/21, at 1-3 (emphasis in original).

Finding no merit to the Landlords' breach-of-contract claims, on May 17, 2021, the magisterial district court dismissed them and entered judgment in favor of the Tenants. *See* Magisterial District Court Judgment, 5/17/21, at 1. The judgment informed the Landlords that they had 30 days to appeal.

On June 10, 2021, the Landlords "instructed their legal counsel . . . to prepare and file a notice of appeal." Landlords' Petition to Appeal *Nunc Pro Tunc* at 1 (some punctuation omitted). The next day, the lawyer "experienced a medical condition of septic arthritis and was required to undergo emergency surgery . . . ." *Id.* He remained hospitalized until June 16, 2021. Upon being discharged, counsel "instructed his staff to prepare and file a notice of appeal," but his staff neglected to do so until June 17, 2021 – *i.e.*, 31 days after the magisterial district court entered the appealed-from judgment. *Id.* The prothonotary docketed the appeal at case number 21-0303.

The Tenants moved to strike the Landlords' appeal as untimely, because they claimed the magisterial-district-court judgment "became final on June 16, 2021," by operation of law. Tenants' Motion to Strike Notice of Appeal at 1. In response, the Landlords alleged good cause for their untimely appeal – namely, the emergency hospitalization of their attorney. "Except for the

unforeseen emergency circumstances, [the Landlords] would have had the capacity to appeal within 30 days after the date of the [magisterial district court's] judgment." Answer to Motion to Strike Appeal at 2 (some capitalization removed). The Landlords also contended the Tenants' "capacity to defend the claim [would not be] adversely affected by allowing [the untimely] appeal to proceed." *Id.*

Then, on August 6, 2021, the Landlords petitioned the trial court for permission to appeal the magisterial district court's judgment *nunc pro tunc*. Nearly two months after the appellate deadline, the Landlords "recognized" that a petition to appeal *nunc pro tunc* was the "vehicle to request a remedy from a late filing of [a] notice of appeal based [on] good cause shown." Landlords' Petition to Appeal *Nunc Pro Tunc* at 2.

Following a hearing, President Judge Michael T. Hudock granted the Landlords' petition to appeal *nunc pro tunc* and denied the Tenants' motion to strike. The trial court did not issue an opinion, and no transcript of the hearing was filed in the certified record.

Two months later, the Landlords sent the Tenants another notice to vacate by October 31, 2021. *See* Landlords' Ex. 5. Therein, the Landlords raised new allegations of breach. They claimed the Tenants "failed to pay utility and service costs to the building" for heating oil, sewer bills, and grease-trap cleaning, totaling $1,242.66. *Id.* at 1. The Tenants refused to leave.

On February 5, 2022, the Landlords served the Tenants with a third notice to vacate by March 14, 2022. This notice increased the list of alleged

breaches – *i.e.*, that the Tenants failed to pay for a back-flow, plumbing test required by law; more heating oil; additional sewer bills; grease-trap cleaning; and garbage removal. The Landlords demanded $2,789.16 in unpaid utility and service fees. *See* Landlords' Ex. 8. Again, the Tenants disregarded the eviction notice and remained in the premises past March 14th. *See* N.T., 10/1/24, at 66.

A week later, the Landlords commenced a second action for breach of contract in the magisterial district court. On April 14, 2022, the court found in favor of the Landlords, and awarded $3,699.41, and granted them the right to retake possession of the premises. The Tenants timely appealed to the trial court, and the prothonotary docketed this new appeal at case number 22-0256.

On June 30, 2022, the lease expired, and the Tenants left the premises. *See* N.T., 10/1/24, at 95.

A month later, the trial court consolidated the two cases, and the matter eventually proceeded to a jury trial. Judge Michael Piecuch presided, because President Judge Hudock had retired at the end of 2021.

At trial, the Landlords abandoned their breach-of-contract claims in case 21-0303, but they continued to seek repayment for utilities and services costs in case 22-0256. The Landlords sought $2,947 for utility and service costs based on the following unpaid expenses:

| 12/8/20 | Backflow Testing by Plumber | $75.00 |
|---------|------------------------------|--------|

| 2/19/21 | Heating Oil | $690.69 |
|---|---|---|
| 4/9/21 | Sewage | $210.62 |
| 8/31/21 | Sewage | $216.65 |
| 10/15/21 | Sewage | $225.23 |
| 10/20/21 | Heating Oil | $894.80 |
| 11/17/21 | Refuse Removal | $61.43 |
| 1/14/22 | Sewage | $172.58 |
| 7/22/22 | Premises Cleaning | $400.00 |

*See* Landlords' Ex. 6, 7, 9, 10, 11, 13, and 14.

Additionally, the Landlords still sought attorney's fees from their initial lawsuit, *i.e.*, case 21-0303. As evidence of attorney's fees and costs, the Landlords offered two bills. Notably, some of the legal services from case 21-0303 appeared on **both** bills. **See** Landlords' Ex. 4 and 15. The aggregate demands for attorney's fees and costs arising from case 21-0303 in Exhibits 4 and 15 were as follows:

| 1/25/21 | Drafting Letter to Tenants' Counsel | $80.00 |
|---|---|---|
| 2/17/21 | Drafting First Notice to Vacate | $100.00 |
| 4/19/21 | Drafting MDC Complaint | $200.00 |
| 4/22/21 | Filing of MDC Complaint Costs | $180.00 |
| 5/11/21 | Attending First MDC Hearing | $600.00 |
| 6/16/21 | Drafting Notice of Appeal to Trial Court | $40.00 |
| 6/17/21 | Late Filing of Notice of Appeal to Trial Court | $176.25 |
| 6/28/21 | Drafting Trial Court Complaint | $400.00 |
| 7/9/21 | Drafting Answer to Motion to Strike Appeal | $150.00 |
| 8/2/21 | Drafting Answer to New Matter | $80.00 |

| 8/2/21 | Drafting Petition to Appeal *Nunc Pro Tunc* | $200.00 |
|---|---|---|
| 5/18/22 | Drafting Pre-Trial Statement | $150.00 |
| 7/1/22 | Attending Pre-Trial Conference | $40.00 |

**See id.**[2]  Thus, the Landlords sought $2,396.25 in attorney's fees and costs from case 21-0303.

As for their second lawsuit (22-0256), the Landlords submitted evidence of the following legal expenses:

| 2/9/22 | Constable Service of Third Notice to Vacate | $100.00 |
|---|---|---|
| 7/29/24 | Jury Selection/Drafting Motion to Enforce | $800.00 |
| 7/30/24 | Filing Motion/Reviewing Exhibits | $1,200.00 |
| 8/2/24 | Preparing Exhibit Books | $1,000.00 |
| 8/5/24 | Preparing Exhibit Books | $800.00 |
| 8/6/24 | Meeting with Landlords to Review Exhibits | $600.00 |
| 8/14/24 | Drafting Answer to Rule to Show Cause | $900.00 |
| 10/1/24 | Trying Jury Trial | $600.00 |

**See** Landlords' Ex. 15.  Thus, the Landlords claimed $6,000 in attorney's fees and costs from their second action.  When combined, the amounts listed in the two exhibits came to $11,343.25.

While cross-examining Mr. Biernstein, the Tenants' attorney asked for a sidebar, because he wanted to question Mr. Biernstein about the judgment

---

[2] The first, third, and fifth items in the above table (drafting letter to Tenants' counsel, drafting magisterial-district-court complaint, and attending hearing before magisterial district judge) appeared on both exhibits.  Hence, we listed the **combined** prices of those items from both exhibits.

the magisterial district court entered against the Landlords in case 21-0303. *See* N.T., 10/1/24, at 59. The Tenants' attorney indicated that many of the items on the Landlords' Exhibits 4 and 15 were for legal filings and work in which the Landlords had not prevailed. He wanted to argue to the jury that some of the attorney's fees in Exhibits 4 and 15 should not be awarded to the Landlords due to the Tenants' prior legal victories.

The Landlords objected. *See id.* at 60. They contended that speaking of the magisterial-district-court judgment entered in case 21-0303 would be prejudicial to their breach-of-contract claims in case 22-0256.

After reviewing the history of the two cases, Judge Piecuch attempted to give preclusive effect to the magisterial district court's judgment in 21-0303 on the question of attorney's fees. He opined from the bench that:

> the first action involved alleged breach, alleged default, and [the Tenants] won that [action]. As a matter of law then, there cannot be attorney's fees that would have been caused by [the Tenants'] default, because there was a judicial determination that [the Tenants] did not default.
>
> . . . I'm going to rule, as a matter of law, that [the Landlords are] not entitled to attorney's fees for that initial action which [the Tenants] won . . . If there [was] a judicial determination at an initial proceeding that [the Tenants were] not in default, then [the Landlords] would not be entitled to attorney's fees under the contract.

*Id.* at 62-64.

The court then prohibited the Landlords from admitting Exhibit 4 into evidence, because it represented attorney's fees and costs from the

- 10 -

magisterial-district-court case in 21-0303. The total amount that the Landlords claimed in Exhibit 4 was $440. The court instructed the jury not to consider Exhibit 4 and not to award the $440 billed therein. ***See id.*** at 86.

However, there was no recognition that Exhibit 15 contained attorney's fees from case 21-0303. As mentioned, Exhibit 15 included several items that were on Exhibit 4, and which the trial court ruled inadmissible.

In light of the trial court's ruling that Exhibit 4 was inadmissible, the Landlords lowered their damage request by $440, and requested an award of $10,436.17 at their closing argument. ***See id.*** at 82. That amount is almost identical to the sum of all the items in Exhibit 15, plus the Landlords' utility and service bills, minus $440 from Exhibit 4 – specifically, $10,463.25.

The jury returned a verdict in favor of the Landlords. It awarded them precisely the amount they requested: $10,463.17. Thus, the verdict included attorney's fees and costs from case 21-0303, which the trial court intended to exclude from the award, as a matter of law.

The Tenants filed post-trial motions, including a renewed claim that the trial court lacked appellate jurisdiction over case 21-0303. The trial court denied relief, and this timely appeal followed.

### III.  Analysis

The Tenants raise three appellate issues as follows:

1.  Did [the Landlords'] admission that they attempted to modify the lease, but not in writing, rendered their hands unclean, and should it have resulted in denial of their claims?

- 11 -

2.      Did the trial court err in denying [the Tenants] permission to explore the issue of precisely what attorney's fees were warranted . . . ?

3.      Was the award of counsel fees improper, excessive, and confiscatory . . . ?

Tenants' Brief at 4.  Before discussing those issues, however, we must decide whether the trial court had appellate jurisdiction over case number 21-0303.

## A. Trial Court's Appellate Jurisdiction

While the Tenants do not challenge the trial court's appellate jurisdiction over case 21-0303 on appeal, they moved to strike the Landlords' notice of appeal as untimely below.  Moreover, they raised the issue in their post-trial motions and Rule 1925(b) statement.[3]  And, even if they had not taken those

_____

[3] At post-trial motions, the court declined to reconsider the jurisdictional issue based on the court's belief that the coordinate-jurisdiction rule prohibited it from reviewing and reversing President Judge Hudock's ruling on the petition for *nunc pro tunc* relief.  **See** Trial Court Opinion, 2/19/25, at 2.  This belief was incorrect.

Historically, post-trial motions were made to the Court of Common Pleas *en banc*, a higher jurisdiction than any single judge of that court.  Beginning with King Edward I's Statute of 1285 on the structure of common-law courts, parties were granted the right to try jury trials before one judge of the Court of Common Pleas, in the county where the cause of action arose.  **See** Riddell, "New Trial at the Common Law," *Yale Law Journal* at 50, available at https://openyls.law.yale.edu/server/api/core/bitstreams/b2562e9f-be90-427e-b37d-131220c913d6/content (last visited 10/22/25). This innovation of civil procedure "relieved juries from the trouble and expense of travelling up to Westminster or elsewhere out of their own county."  **Id.**  These Courts of *Nisi Prius* (Latin, meaning "not unless first," in other words, "courts of original jurisdiction") were the forerunners of today's trial courts.  **See id.** at 51.

*(Footnote Continued Next Page)*

steps below, we would still "raise the issue *sua sponte*, because it affects the jurisdiction of the [trial] court." ***Brickman Group, Ltd. v. CGU Ins. Co.***, 829 A.2d 1160, 1163 (Pa. Super. 2003). "[T]he appealability of an order goes to the jurisdiction of the appellate court and may be raised *sua sponte*." ***Murphy v. Brong***, 468 A.2d 509, 510 (Pa. Super. 1983).

"Because jurisdiction is a pure question of law, our standard of review is *de novo*, and our scope of review is plenary." ***Strasburg Scooters, LLC v. Strasburg Rail Rd., Inc.***, 210 A.3d 1064, 1068 (Pa. Super. 2019). As we explain below, the judgment of the magisterial district court became final on

---

Following a jury trial, the Statute of 1285 directed that the record and verdict "shall be returned into the Bench," *i.e.*, the Court of Common Pleas *en banc*, at Westminster, "and there shall judgment be given and there they shall be enrolled." ***Id.*** at 50. Claims of error "could not be made to the *Nisi Prius* judge but [had to] be made to the court" *en banc* after the record returned to Westminster. ***Id.*** at 53. This established the practice of filing post-trial motions to correct prior errors before the Court of Common Pleas *en banc*. An argument before the court of common pleas *en banc* is still permitted under Pennsylvania Rule of Civil Procedure 227.2, but, typically, one judge hears and decides the post-trial motions. Even so, that single judge sits in the higher jurisdiction of the court of common pleas *en banc*. Hence, a single, post-trial-motions judge may review and reverse prior errors of a trial judge in the same case.

As the Supreme Court of Pennsylvania has held, "the post-trial motion process is distinct procedurally" from prior stages of the case, and "the considerations of the judge are different at each procedural stage (rendering a verdict at the conclusion of trial versus correcting mistakes made during the earlier trial process) . . . ." ***Riccio v. American Republic Ins. Co.***, 705 A.2d 422, 425–26 (Pa. 1997). Therefore, "the coordinate-jurisdiction rule does not apply to bar a substituted judge hearing post-trial motions from correcting a mistake made by [a prior] judge . . . ." ***Id.***

- 13 -

June 16, 2021 (30 days after the entry of judgment in that court). Thus, it was no longer appealable on June 17, 2021.

Pennsylvania Rule of Civil Procedure 1002(A) governs time and method of appeals from magisterial district courts. According to the Rule, "A party aggrieved by a judgment for money, or a judgment affecting the delivery of possession of real property arising out of a nonresidential lease, may appeal the judgment within 30 days after the date of the entry of the judgment by filing with the prothonotary . . . a notice of appeal on a form . . . prescribed by the State Court Administrator together with a copy of the notice of judgment issued by the magisterial district judge." Pa.R.C.P. M.D.J. 1002(A) (some capitalization omitted). Critically, "The prothonotary **shall not** accept an appeal from an aggrieved party that is presented for filing more than 30 days after the date of entry of the judgment without leave of court and upon good cause shown." **Id.** (emphasis added).

Rule 1002 is not merely a polite suggestion from the Supreme Court of Pennsylvania. The Rule coincides with and effectuates the will of the General Assembly regarding appellate jurisdiction of all courts in this Commonwealth.

The Constitution of the Commonwealth of Pennsylvania expressly grants the legislature exclusive power to set the jurisdiction of our courts. The constitution dictates that courts of common pleas "hav[e] unlimited original jurisdiction in all cases **except as may otherwise be provided by law.**" Pa. Const. art. V § 5(b) (emphasis added). The legislature has provided by law that "an appeal from a tribunal or other government unit to a court or from a

court to an appellate court must be commenced within 30 days after the entry of the order from which the appeal is taken . . . ." 42 Pa.C.S.A. § 5571(b).

Because the magisterial district court entered its judgment in case 21-0303 on May 17, 2021, the 30-day period for appealing that judgment to the trial court expired on June 16, 2021. The Landlords' notice of appeal, filed on June 17, 2021 with the Prothonotary of Union County, was therefore facially untimely. Hence, under Pa.R.C.P. M.D.J. 1002(A), the prothonotary should *not* have accepted the notice of appeal for filing.

The Landlords do not dispute that their notice of appeal was untimely, but they argued below that the untimeliness was excusable. The only grounds that the Landlords relied upon was their attorney's hospitalization during the 30-day appellate period. This is an insufficient basis for allowing an untimely appeal to proceed, as a matter of law.

We have held that hardship alone is an insufficient ground to permit a party to file an appeal beyond the 30-day deadline of Rule 1002(A). *See Amicone v. Rok*, 839 A.2d 1109, 1113 (Pa. Super. 2003); *Goldberg v. Goldberg*, 461 A.2d 1307, 1308-09 (Pa. Super. 1983). Rather, in a civil case, such as this, a court may allow such an appeal only if the delay in filing is caused by extraordinary circumstances involving fraud or a breakdown in the court's operation. *See Amicone*, 839 A.2d at 1113; *Goldberg*, 461 A.2d at 1309.

Here, the Landlords do not allege any fraud or a breakdown in court operations. They also do not contend that they received the judgment of the

- 15 -

magisterial district court in an untimely fashion. Nor do they assert that they were misled concerning the requirements or deadline for filing the appeal. To the contrary, the magisterial-district-court judgment correctly advised the Landlords that "any party aggrieved by a judgment . . . may appeal within 30 days after the entry of judgment by filing a notice of appeal with the Prothonotary/Clerk of the Court of Common Pleas, Civil Division." Magisterial District Court Judgment, 5/17/21, at 1.

Further, we do not find a non-negligent reason to excuse the Landlords' untimely appeal to the trial court. In **Bass v. Commonwealth**, 401 A.2d 1133 (Pa. 1979), a minority-majority of the Supreme Court granted a petition to appeal *nunc pro tunc*. There, an appellant's attorney authored a notice of appeal from Commonwealth Court to the Supreme Court and gave it to his secretary for filing. However, the secretary fell ill and did not return to the office until **after the appellate period expired**. Plaintiff filed a petition to appeal *nunc pro tunc* with the Supreme Court, and three out of five Justices voted to grant relief. **Id.** at 1134. In doing so, **Bass** held that parties should not suffer the loss of their appellate rights, due to the non-negligent actions of their attorneys.

Here, unlike the secretary in **Bass**, the Landlords' attorney was not hospitalized until after the appellate period expired. Instead, he left the hospital on June 16, 2021, the last day on which to file the appeal, and he directed his staff to do so. However, the attorney's staff then failed to file until the following day.

- 16 -

Critically, the Landlords offer no reason for why the attorney's staff failed to file the notice of appeal on June 16, 2021. Had they been exercising due and reasonable care, the Landlords' attorney and staff would have acted immediately to file the notice of appeal by close of business on June 16, 2021. They did not.

Hence, we hold that the non-negligent exception to appellate deadlines, as established in *Bass* for granting *nunc pro tunc* relief, does not apply. *See e.g. Carr v. First Commonwealth Bank*, 335 A.3d 1199, 1201 (Pa. Super. 2025), *appeal granted*, 97 WAL 2025, 2025 WL 2649782 (Pa. 2025) (holding that non-negligent-reason exception did not apply where an attorney's family member committed suicide during the appellate period from arbitration and explaining that this Court has been reluctant to extend the holding of *Bass*). *See also Robinson v. Hutchinson*, 831 MDA 2023, 2024 WL 1479455 (Pa. Super. 2024) (non-precedential) (reaching the same result with respect to an untimely appeal from the magisterial district court).

It is foreseeable that an attorney might suffer a medical emergency and require hospitalization, but the timing of such emergencies is not. Thus, attorneys are expected to have contingency plans in place to protect clients from deadlines like here, where situations arise that are beyond the attorney's control. There is no evidence that the Landlords' attorney had such a contingency plan in place or that the plan fell through for a reason beyond counsel's control. Thus, the attorney's failure to make contingency plans for

a medical emergency, such as the one he suffered in June of 2021, is not a valid reason to grant *nunc pro tunc* relief.

Additionally, counsel here further neglected to petition to appeal from the magisterial district court *nunc pro tunc* until August 6, 2021 – 81 days after the entry of final judgment in the magisterial district court and **51 days after the notice of appeal was due**. Hence, even if the Landlords had a non-negligent reason for not filing their notice of appeal by June 16, 2021, they do not explain the lengthy delay in seeking *nunc pro tunc* relief. We can only conclude either counsel did not care or he did not know that the Rules of Procedure required him to file a petition for permission to appeal *nunc pro tunc* as soon as possible. Either way, even if we could excuse the Landlords' untimeliness under the **Bass** exception in early June 2021, they forfeited the exception by not petitioning for *nunc pro tunc* relief until August 6, 2021.

Simply put, the Landlords' appeal to the trial court was untimely. They proved no fraud, breakdown in court operations, or non-negligent reason for their untimely appeal. Thus, the trial court erroneously granted the Landlords' petition to appeal *nunc pro tunc* and erroneously denied the Tenants' motion to strike the notice of appeal in case 21-0303.

Because the trial court lacked appellate jurisdiction over case 21-0303, we must vacate the judgment entered at that docket as a legal nullity and reinstate the judgment of the magisterial district court. In light of our decision that the Landlords' appeal from the magisterial district court must be quashed,

the Landlords are not the prevailing party in any of the activity that occurred at docket number 21-0303 prior to the consolidation of the two lawsuits.

Under the lease, the Landlords could only recover attorney's fees and court costs in "an action to recover . . . any and all consequential damages caused by" the Tenants' breach. Landlords' Ex. 1 at 5, ¶9. As Judge Piecuch correctly opined during the jury trial, because the Landlords did not prevail before the magisterial district court in 21-0303, they failed to prove a breach by the Tenants in that case. Hence, the Landlords are not entitled to any attorney's fees from their first lawsuit.

Critically, a judgment of any court that lacked jurisdiction "is null and void and is subject to attack by the parties in the same court or may be collaterally attacked at any time." ***Barnes v. McKellar***, 644 A.2d 770, 773 (Pa. Super. 1994). We must therefore review the verdict and judgment, as entered at 22-0256, to ensure that it will not be susceptible to collateral attack due to the jury's accidental inclusion of damages from case 21-0303.

As our review of the above facts reveals, several of the billable hours in Landlords' Exhibit 15 are for services rendered solely in the Landlords' untimely appeal, as well as at the magisterial district court. Those legal services and costs arising from the case at 21-0303 totaled $2,396.25. ***See*** Landlords' Ex. 4 and 15. But for the jurisdictional error of the trial court in granting *nunc pro tunc* relief to the Landlords, the jury would have never heard, seen, or considered any of those amounts. However, the trial court

sent the full Exhibit 15 into the jury deliberations, and that exhibit formed the basis for most of the verdict.

While the trial court rightly attempted to keep the legal fees that the Landlords incurred at the magisterial district court from the jury, it is clear that the jury awarded attorney's fees and costs from that action. The Landlords reincorporated the legal fees from the magisterial district court in Exhibit 15, and the jury awarded the exact number of damages that the Landlords requested in their closing argument. Thus, the jurisdictional error in 21-0303 obviously influenced the verdict and judgment entered at 22-0256. We must remedy that taint by imposing remittitur. Otherwise, the judgment entered at 22-0256 will be open to collateral attack due to the lack of trial-court jurisdiction in 21-0303. **See Barnes**, **supra**.

The only damages that the trial court and the jury had jurisdiction over were those presented in case 22-0256, along with the legal fees that the Landlords incurred in seeking those damages. The damages included all of the utility and service bills, totaling $2,947. **See** Landlords' Ex. 6, 7, 9, 10, 11, 13, and 14. Also, the Landlords submitted evidence that they owed their attorney $6,000 for his work in the second lawsuit. **See** Landlords' Ex. 15.

Given our determination that the trial court lacked appellate jurisdiction over case 21-0303, the Landlords are only entitled to $8,947 in damages in case 22-0256, as a matter of law. Therefore, we must reduce the verdict in favor of the Landlords to that amount.

B.      *Doctrine of Unclean Hands*

Turning to the Tenants' first appellate issue, they contend the Landlords may not bring this action due to the equitable doctrine of unclean hands. They believe that, because the Landlords gave them a six-month-grace period to pay the $2,000 security deposit, rather than immediately commence eviction proceedings, the Landlords showed a "willingness to operate outside the lease agreement . . . when it suited their purposes." Tenants' Brief at 8. We are told that the Landlords "lost the right to complain about supposed violations of the agreement when they countenanced and indulged in the same." *Id.* at 8-9.

The trial court summarily dismissed this claim, because, as the Tenants admit, under the doctrine of unclean hands, a "court may deprive a party of *equitable relief*." *Id.* at 8 (quoting *Terraciano v. Commonwealth, Department of Transportation*, 753 A.2d 233, 237 (Pa. 2000) (emphasis added). As the trial court explained in its 1925(a) Opinion, "The concept of requiring 'clean hands' applies when a party is seeking equitable relief (e.g., injunctive relief, specific performance). Here, the [Landlords] were seeking legal remedies (money damages), not equitable relief." Trial Court Opinion, 2/19/25, at 2-3.

We agree. A cause of action for breach of contract first emerged from the law of torts in the 16th century as the writ of assumpsit. *See* William L. Prosser, *The Borderland of Tort and Contract*, SELECTED TOPICS ON THE LAW OF TORTS at 384 (1953). A writ of assumpsit for breach of contract has always commenced an action at law, not a bill of equity. *See id.* Plaintiffs could

- 21 -

thereafter "pursue a breach of contract action in a civil suit at law or an equitable action seeking specific performance of the contract." ***Caccavo v. Caccavo***, 565 A.2d 1199, 1201 (Pa. Super. 1989).

The Landlords sought monetary damages for the Tenants' breaches of the contract. Therefore, the trial court correctly ruled that this was an action at law to which the equitable doctrine of unclean hands did not apply.

We dismiss the Tenants' first appellate issue as meritless.

*C.    Apportionment of Attorney's Fees*

Next, the Tenants assert that the trial court erroneously denied them an opportunity "to explore the issue of precisely what attorney's fees were warranted, [because] . . . there were several instances where [the Landlords] filed against [the Tenants], but were rebuffed." Tenants' Brief at 9. They claim that, "because the defense was not permitted to delve into specifics of legal bills, [the Tenants] are now financially responsible for instances where they were in the right and [the Landlords] were in the wrong." ***Id.*** at 9-10.

The Landlords reply that no such error occurred, because the Tenants were never denied the opportunity to explore the specifics of attorney's fees in Exhibit 15. In their view, the Tenants never attempted to litigate individual charges, except for the sidebar on the magisterial-district-court proceeding in 21-0303. The Landlords claim that that discussion prompted the trial court to exclude any evidence of their attorney's fees from the magisterial district court by refusing to admit Exhibit 4.

- 22 -

As we explained, the trial court's exclusion of Exhibit 4, while correct, did not prevent all of the extra-jurisdictional evidence from reaching the jury. Regardless, our decision to reduce the verdict by excluding pre-consolidation attorney's fees in Section III(A), **supra**, has rendered any error harmless.

Thus, we dismiss the Tenants' second issue as moot.

D.    *Award of Attorney's Fees & Costs*

Lastly, the Tenants ask whether the jury's award of attorney's fees was "improper, excessive, and confiscatory," such that they must "be severely diminished or eliminated?" **Id.** at 10.   Because the Tenants have neglected to present a legal argument in support of this issue, they have waived it.

"The issue of waiver presents a question of law, and, as such, our standard of review is *de novo*, and our scope of review is plenary." **Trigg v. Children's Hospital of Pittsburgh of UPMC**, 229 A.3d 260, 269 (Pa. 2020).

The Pennsylvania Rules of Appellate Procedure require appellants to present a cogent, complete argument for each issue raised in this Court.  "The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part . . . the particular point treated therein, followed by **such discussion** and citation of authorities as are deemed pertinent."  Pa.R.A.P. 2119(a) (emphasis added).  In other words, legal analysis (applying the rules to the facts) is required to craft a reviewable argument.  It is insufficient to issue spot, quote a rule or rules, and simply announce one's conclusion.

Such an approach leaves this Court in the position of having to guess at what legal theories might support the claim of error. Moreover, it requires us to act as appellate counsel and adjudicator, which is inappropriate in any issue where this Court may not raise and decide the question *sua sponte*. Thus, "[w]hen an appellant's argument is underdeveloped, we may not supply it with a better one." ***Commonwealth v. Deible***, 300 A.3d 1025, 1035 (Pa. Super. 2023).

Here, the Tenants make no appellate argument whatsoever. They afford their final issue one page of briefing. ***See*** Tenants' Brief at 11. That page is a string of quotations from ***In re Estate of LaRocca***, 246 A.2d 337 (Pa. 1968), and ends in a block quote listing eleven factors that trial courts are to consider when awarding attorney's fees.

The Tenants offer ***no analysis*** of those factors, much less explain how they relate to the jury's finding of fact that the evidence of the Landlords' legal bills was credible. Instead, the Tenants simply provide us with one, conclusory sentence: "Respectfully, the [Tenants] aver that under such an analysis, a judgment of over $10,000 when over 70% of same in counsel fees results in an injustice." Tenants' Brief at 12. Maybe so, but in the absence of any legal analysis ***by the Tenants***, we'll never know.

Final issue dismissed as waived.

## VI. Conclusion

In sum, the General Assembly and Rules of Procedure mandate that appellants have 30 days to appeal from a magisterial district court to a trial

court. Trial courts may only disregard the 30-day mandate to cure fraud, a breakdown in the court system, or a non-negligent circumstance. There is no proof that any of those extraordinary circumstances occurred in this matter. Therefore, we must vacate the trial-court judgment entered at 21-0303 as a legal nullity, reinstate the final judgment of the magisterial district court, and modify the trial-court judgment entered at 22-0256 to comport with the jurisdictional restraints that the legislature has placed upon courts of common pleas.

Order denying post-trial relief affirmed to the extent it denies relief on the issues that the Tenants raised in this appeal. Order denying post-trial relief reversed to the extent it denies relief on the issue of whether the trial court had jurisdiction over the appeal docketed at 21-0303. Order denying motion to strike appeal reversed; order granting petition to appeal *nunc pro tunc* reversed. Appeal to the trial court docketed at 21-0303 quashed.

Judgment at docket 21-0303 vacated. Judgment at docket number MJ-17301-LT-0000004-2021 reinstated. Judgment at docket number 22-0256 modified to $8,947; that judgment affirmed as modified.

PJ Lazarus joins this Opinion. PJE Stevens files a Concurring Opinion.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 01/20/2026